**Karlene H. COBB et al., Plaintiffs,**

v.

**NETWORK CINEMA CORP., Defendant.**

**Civ. A. No. 16134.**

United States District Court,
N. D. Georgia,
Atlanta Division.
March 1, 1972.

Coleman R. Rosenfield, Hallandale, Fla., Baxter L. Davis, Davis, Matthews & Quigley, Atlanta, Ga., Jerry S. Cohen, Herbert E. Milstein, Michael D. Hausfeld, Washington, D. C., A. Blenn Taylor, Jr., Taylor & Bishop, Brunswick, Ga., for plaintiffs; Harold E. Kohn, P. A., Philadelphia, Pa., of counsel.

Simon Rose, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, E. Smythe Gambrell, Edward W. Killorin, Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., Chief Judge.

This suit arose over a franchise dispute between the named plaintiffs and the defendant who entered into New York contracts establishing "Jerry Lewis Cinemas" in designated territories in Georgia. Under the terms of each agreement, it was provided:

"ARBITRATION. Any controversy, dispute or question arising out of, in connection with, or in relation to this agreement or its interpretation, performance or nonperformance of any breach thereof shall be determined by arbitration conducted in New York City in accordance with the then existing rules of the American Arbitration Association, and judgment upon any award, which may include an award of damages, may be entered in the highest State or Federal court having jurisdiction. Nothing contrained herein shall in any way deprive the COMPANY of its right to obtain injunction or other equitable relief as previously set forth herein."

Following the inception of the controversies, the defendant has initiated proceedings for arbitration under the rules of the American Arbitration Association.

In the multi-count petition, the plaintiffs seek to move as a class on a broad front seeking damages on the following claims:

COUNT I   — Anti-Trust Violations (Sherman Act)
COUNT II   — Anti-Trust Violations (Clayton Act)
COUNT III  — Securities Act Violations (Sec. 22(a))
COUNT IV  — Common-Law Fraud in inducement
COUNT V   — Securities Act Violations (Sec. 17(a), 10(b))
COUNT VI  — Breach of Contract (UCC)
COUNT VII — Breach of Contract (UCC).

By way of temporary relief, the plaintiffs presently seek to restrain and enjoin the New York arbitration proceedings. By way of response, the defendant denies plaintiffs' claims, asserts its right to proceed with arbitration; and seeks to stay this suit pending its outcome under the provisions of 9 U.S.C. § 3. The contest thus presents the somewhat complex question of the viability of a broad arbitration clause in the face of the alleged violations of public statutes.

1. *Public-policy.*

■ At the outset, plaintiffs contend that the arbitration proceedings must be enjoined and the broad arbitration clause declared void under the strong public policy of Georgia. The state courts have indeed expressed specific disapproval of such clauses. Thus,

> " 'According to numerous decisions a general agreement to arbitrate *all questions* which may arise in the execution of a contract, both as to liability and loss, should be treated as against public policy and void, as an attempt to oust the courts of jurisdiction.' State Hwy. Dept. of Georgia v. MacDougald Construction Co., 189 Ga. 490, 504, 6 S.E.2d 570, 578. More accurately stated, the rule which obtains in this state is that 'A common-law agreement, . . . to submit the validity and effect of a contract, or to submit all matters in dispute, to arbitration, may be revoked by either party at any time before the award.' Parsons v. Ambos, 121 Ga. 98, 101, 48 S.E. 696, 697. See also: Gettys v. Mack Trucks, Inc., 107 Ga.App. 694(2), 131 S.E.2d 205; 5 Am.Jur.2d 547–548, Arbitration and Award, § 36."

Wright v. Cecil A. Mason Constr. Co., 115 Ga.App. 729, 155 S.E.2d 725 (1967). New York has no such policy. To the contrary, it has a legislative policy in its favor. Moreoover, there is a strong national policy in favor of arbitration:

> *"Validity, irrevocability, and enforcement of agreements to arbitrate.* A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The initial question presented, therefore, is whether this federal district court, sitting in this diversity case in Georgia is *Erie-bound* to follow the public policy of the state.

In this respect, the court is clearly bound by the federal policy. The issue was squarely ruled upon by the Supreme Court in the case of Prima Paint v. Flood & Conklin, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). In the face of *Erie*, "the question is whether Congress may proscribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate. The answer to that can only be in the affirmative. And it is clear beyond dispute that the federal arbitration statute is based upon and confined to the incontestable federal foundations of 'control over interstate commerce and over admiralty.' " (at 405, 87 S.Ct. at 1806–1807). Thus, as a procedural matter, the federal policy is beyond the reach of the state under *Erie*, and is to be enforced by this court if the circumstances are appropriate.

2. *The securities question.*

■ Plaintiffs rely heavily upon the securities counts and the leading case of Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), which holds that the non-waiver provisions of the Securities Act (15 U.S.C. § 77n) generally preclude arbitration as a forum for resolution of its violations. Cf. Brown

v. Gilligan, Will & Co., 287 F.Supp. 766 (S.D.N.Y.1968). See also Shapiro v. Jaslow, 320 F.Supp. 598 (S.D.N.Y.1970). However, in order to invoke such authority, it is first necessary to establish that the franchise in question is a security within the meaning of the Act. 15 U.S.C. § 77b(1). Of the several items listed, only "investment contract" seems to be possibly applicable as "franchise" itself is not expressly mentioned therein.

The Supreme Court and this circuit clearly define "an investment contract for purposes of the Securities Act" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." S.E.C. v. W. J. Howey Co., 328 U.S. 293 at 299, 66 S.Ct. 1100 at 1103, 90 L.Ed. 1244 (1946); Roe v. United States, 287 F.2d 435 at 438 (5th Cir. 1961), cert. den. 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (1961). In an exhaustive opinion, it has recently been correctly concluded that franchise agreements of the type under investigation do not constitute "investment contracts" and are beyond the ambit of the Securities Act. Mr. Steak, Inc. v. River City Steak, Inc., 324 F. Supp. 640 (D.Colo.1970). See also Chapman v. Rudd Paint & Varnish Company, 409 F.2d 635 (9th Cir. 1969). Under recognized standards, it is plain to the court that the contract here does not rely solely on the efforts of others and consequently is not a protected security under the Act.[1] It follows that plaintiffs cannot proceed in either forum, court or arbitration, under Counts III and V, and they must be dismissed.

### 3. *The fraud and contract claims.*

■ The remaining issues involve a determination of whether the other claims are "of a character inappropriate for enforcement by arbitration." See Wilko v. Swan, 201 F.2d 439 at 444 (2d Cir. 1953). The gravamen of plaintiffs' complaint is that the whole scheme was infected by fraud and this is expressed in Counts IV, VI, and VII and to some extent in the anti-trust claims under Count II. Where such attacks are made on contracts containing broad arbitration clauses, the courts have uniformly held such questions appropriate for the arbitration process. Prima Paint Corp. v. Flood & Conklin, 388 U.S. 395, 87 S. Ct. 1801, 18 L.Ed.2d 1270 (1967); Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), cert. granted 362 U.S. 909, 80 S.Ct. 682, 4 L. Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960); A & E Plastik Pak Co. v. Monsanto Company, 396 F.2d 710 (9th Cir. 1968). Likewise formal claims for breach of contract are subject to arbitration. Indeed they are the normal subject-matter of such proceedings. Southeastern Enameling Corp. v. General Bronze Corp., 434 F.2d 330 (5th Cir. 1970). More specifically, fraud, damages, trade-mark and similar claims arising out of licensing and distributorship agreements are appropriate for arbitration under a broad clause. E. g. Necchi Sewing Machine Sales Corp. v. Sewline Company, 194 F.Supp. 602 (S.D.N.Y. 1960); Saucy Susan Products, Inc. v. Allied Oil English, Inc., 200 F.Supp. 724 (S.D.N.Y.1961). It is apparent therefore, having once determined the validity of the arbitration clause itself, that the court should not stay arbitration on the basis of the claims asserted in the fraud and contract counts. (IV, VI, and VII). To the contrary, arbitration should proceed unless barred by consideration of the anti-trust claims.

[1]. This is not to say that all franchise agreements are necessarily not "securities." There are several types wherein the purchaser may be inactive or led to believe he will be inactive which may well fall within the *Howey* standards. See the discussion in Green, The Regulation of Franchising Under the Securities Laws, 6 Ga.B.J. 357 (1970). From their recent popularity and reported abuses, franchises may be a fit subject for strong regulation. However, such policy should originate with the Congress rather than judicial overreach.

4. *The Anti-Trust claims.*

This question has several sides, including not only the issue of whether such claims are arbitrable; but, if not, whether the court should stay its action thereon pending arbitration of the other claims or enjoin the arbitration until the anti-trust issues are resolved. The answer to neither is certain.

While the Supreme Court has apparently not expressed itself on the anti-trust issue, there has generated a considerable body of authority in the area. By a series of opinions, the Second, Eighth and Ninth Circuits have fashioned a general rule to the effect that anti-trust claims are not subject to arbitration. American Safety Equipment Corp. v. J. P. McGuire & Co., 391 F.2d 821 (2d Cir. 1968); A & E Plastik Pak Co. v. Monsanto Co., 396 F.2d 710 (9th Cir. 1968); Power Replacements, Inc. v. Air Preheater Company, 426 F.2d 980 (9th Cir. 1970); Helfenbein v. International Industries, Inc., 438 F.2d 1068 (8th Cir. 1971). Conceding the existence of this authority and its general applicability to the claims at hand, defendant nonetheless insists that there is a recognized exception when the agreement to arbitrate is made after the dispute arises. Such an exception to the above authorities in anti-trust matters was only recently expressed by the Second Circuit in the case of Coenen v. Pressprich & Co. et al., 453 F.2d 1209 (2d Cir. 1972) and expressly left open as a possibility in *American Safety Equipment* (391 F.2d at 827) and *Power Replacements* (426 F.2d at 984). In the analogous situation under the Securities Act, likewise left open in *Wilko*, voluntary submission to arbitration of an existing controversy is a valid one. Moran v. Paine, Webber, Jackson and Curtis, 389 F.2d 242 (2d Cir. 1968). The Fifth Circuit has recognized such an exception in Securities Act claims also. Gardner v. Shearson, Hammill & Company, 433 F.2d 367 (5th Cir. 1970). Accordingly, it appears likely that voluntary submission of an existing anti-trust controversy to arbitration would also be an exception in this and other circuits.

The problem here is to define "voluntary submission." In *Moran,* the entire arbitration proceedings had concluded with an award unsatisfactory to the plaintiff before the suit was filed. Likewise in *Gardner,* the arbitration process was already concluded at the time of suit. In the *Pressprich* case, the plaintiff came immediately to court, but had previously submitted his willingness to abide by arbitration by joining the Stock Exchange *after* his dispute arose. Thus, in each instance there was some affirmative action by the complainant indicating a desire to arbitrate intervening between the dispute and the filing of suit.

Here the facts are undisputed. The problem is whether they are tantamount to voluntary submission. Following the claimed contractual default of plaintiff Solomon by December 1, 1971, the defendant gave notice of arbitration by serving its Demand on December 15, 1971. On December 28, 1971, Coleman R. Rosenfield, Esquire, attorney for Solomon, filed a motion seeking an extension of time in which to file an answer and counterclaim to the proceeding. By letter dated January 4, 1972, the American Arbitration Association directed that the answer and counterclaim be filed on or before January 20, 1972.

On January 17, 1972, Solomon apparently named Arbitrators and filed an answer and counterclaim with the Association alleging that Network fraudulently induced Solomon to enter into the agreement; that there has been a failure of consideration; that Network has failed to perform its obligations under the agreement and that Network has engaged in illegal acts in violation of the anti-trust and securities laws of the United States. At the same time, a motion was made to dismiss A. Blenn Taylor as a party to the agreement.

By letter addressed to the Association dated January 24, 1972, counsel for Solomon requested that a panel of three ar-

bitrators be appointed. However, on January 25, 1972, counsel for Solomon wrote a letter seeking to reject arbitration. Subsequently, on January 27, 1972, Solomon and two other franchisees of Network filed this action in the United States District Court for the Northern District of Georgia. A copy of the complaint was sent to the Association by Solomon's counsel together with a letter dated January 28, 1972, requesting that the complaint be "considered an addendum to the pleadings filed heretofore by the Respondent." Thereafter, an exchange of correspondence took place between counsel for Solomon and Network and the Association with regard to the designation of the arbitrator or arbitrators and the setting of a date for a hearing of the arbitration.

Had the plaintiff only participated in the arbitration proceedings to the point of response and the naming of arbitrators, the court would have no difficulty in concluding there was no voluntary submission. A & E Plastik Pak Co. v. Monsanto Company, 396 F.2d 710(4) (9th Cir. 1968) is good authority for such a position.[2] The argument of defendant and the concern of the court lies not in the response to defendant's Demand, but in the Counterclaim. The Demand itself, of course, placed no anti-trust claims as such before the Arbitration Association. However, plaintiff's counterclaim affirmatively injected the issues into the proceedings before suit was filed here. Specifically, it provides:

"4. Respondents allege that Claimant has engaged in illegal acts against the Respondents violative of the antitrust laws of the United States of America; further, that the franchise agreement of the Claimant is contrary in text and application to the anti-trust laws of the United States of America."

"6. Respondents allege that the aforesaid acts and deeds of Claimant have injured the Respondents and said Respondents have suffered damages by virtue of the acts of the Claimant and demand payment therefor."

On balance the court concludes that the affirmative filing of the anti-trust claims not previously before the Arbitration Association and well before the filing of this suit is such "voluntary submission"[3] as to come within the exception. Such a conclusion is consistent with the authorities governing general and special appearances in jurisdictional contests. See 6 C.J.S. Appearances § 12 ff. "One who comes into court seeking relief against the plaintiff by cross-bill or counter claim and actively presses his claim thereby invokes the court's jurisdiction in the case so that he cannot thereafter question the authority of the court to pass upon all questions raised between himself and his adversary. (Citations)." Kincade v. Jeffery-DeWitt Insulator Corp., 242 F.2d 328(9) (5th Cir. 1957).

Even if this conclusion is erroneous, the court is persuaded to the eventual result by consideration of the second facet of the question: namely, the priority between court and arbitration. Assuming arguendo that the antitrust claims can never be arbitrated or that plaintiff's action is not a submission of an existing controversy,[4] there is ad-

---

2. It should be noted, however, in that case the complainant "at all times reserved its right to refuse to arbitrate, attempted to have the proceedings abated while it filed its suit in the District Court, and was forced to participate in the selection of arbitrators because failure to do so would have resulted in the arbitration of all issues (assuming that it failed to obtain an injunction) by abitrators selected by Monsanto alone." Note 4, page 714. No such "limited appearance" was made by the plaintiff here.

3. Additionally, under New York law the failure of a party to apply for a stay of arbitration within ten days after being served with notice of arbitration is apparently treated as an admission of the validity of the arbitration agreement and as a voluntary submission to arbitration. See N.Y.C.P.L.R. § 7503(c).

4. This raises the interesting question whether all plaintiffs in this self-styled class suit must rise and fall on plaintiff Solomon's actions. He is apparently the

mitted discretion in the court on the question of stay. American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 at 828, 829 (2d Cir. 1968); A & E Plastik Pak Co. v. Monsanto Company, 396 F.2d 710 at 716 (9th Cir. 1968).

A sound judgment could be made by the court if it could ascertain with confidence whether the anti-trust questions plainly void the entire contract. E. g. Ring v. Spina, 148 F.2d 647 (2d Cir. 1945). However, plaintiffs here are in "the same position before this court as a defendant to a contract action who argues that his contract is void because it violates the antitrust laws. Such attacks by way of defense are not encouraged in the federal courts." Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971). Moreover, the preponderating bulk of the dispute appears to concern defendant's claims of debt and plaintiff's defenses, primarily fraud, thereto. Under such circumstances, the court is persuaded that the anti-trust defenses have only meagre chances of success. "As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court." Kelly v. Kosuga, 358 U.S. 516 at 518, 79 S.Ct. 429 at 431, 3 L.Ed.2d 475 (1959). See also Bruce's Juices, Inc. v. American Can Co., 330 U. S. 743 at 750, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Helfenbein v. International Industries, Inc., 438 F.2d 1068 (8th Cir. 1971); American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 17 N.Y.2d 849, 271 N.Y.S.2d 284, 218 N.E.2d 324, cert. den. 385 U.S. 931, 87 S.Ct. 1, 17 L.Ed.2d 37 (1966). "Antitrust defenses are allowed only in cases where the intrinsic illegality of the contract is so clear that enforcement would make a court party to the precise conduct forbidden by the law." Dickstein v. duPont, 443 F.2d 783 at 786 (1st Cir. 1971). It also appears (as in Pressprich) that the anti-trust "coercion" claims are but the same claims of fraud and misrepresentation in the arbitrable counts with another label.

Under such authorities, the court is persuaded that in most, if not all, of its aspects, this franchise agreement would not be rendered unenforceable through the anti-trust claims alleged by plaintiffs and that arbitration should proceed.

Accordingly, for the reasons stated herein, it is the judgment of the Court that Counts III and V be dismissed; that plaintiffs' prayer for a temporary injunction against the arbitration proceedings be denied; and that defendant's application for stay of this suit under 9 U.S.C. § 3 be and the same is hereby granted.

It is so ordered.

---

only one "submitting" to arbitration. In view of what follows, it is not necessary to decide whether Solomon can be claimed for purposes of the injunction, but disavowed for his personal actions. This is but one perplexing aspect of the general effect of class actions which has not yet been judicially finalized. Thus far in this district, parties claim to be within the class only if the representative wins and out of it if he loses.